## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| AMBER THOMPSON, | CASE NO. 1:22-CV-01067-DAC |
| Plaintiff, | MAGISTRATE JUDGE DARRELL A. CLAY |
| vs. | **MEMORANDUM OPINION AND ORDER** |
| COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, | |
| Defendant. | |

### INTRODUCTION

Plaintiff Amber Thompson challenges the decision of the Commissioner of Social Security denying disability insurance benefits (DIB). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On June 21, 2022, pursuant to Local Civil Rule 72.2, this matter was referred to me to prepare a Report and Recommendation. (Non-document entry dated June 21, 2022). On June 22, 2022, the parties consented to my jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. Following review, and for the reasons stated below, I **AFFIRM** the Commissioner's decision denying DIB.

### PROCEDURAL BACKGROUND

Ms. Thompson filed for DIB on January 29, 2020 alleging a disability onset date of June 1, 2013. (Tr. 89). Her claims were denied initially and on reconsideration. (Tr. 107-11, 117-127). She

1

then requested a hearing before an Administrative Law Judge. (Tr. 128-29). Ms. Thompson, represented by counsel, and a vocational expert (VE) testified at a hearing before the ALJ on April 23, 2021. (Tr. 34). On June 17, 2021, the ALJ issued a written decision finding Ms. Thompson not disabled. (Tr. 14-33). The Appeals Council denied Ms. Thompson's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-8; *see* 20 C.F.R. §§ 404.955, 404.981). Ms. Thompson timely filed this action on June 18, 2022. (ECF #1).

FACTUAL BACKGROUND[1]

## I.  PERSONAL AND VOCATIONAL EVIDENCE

Ms. Thompson was 34 years old on her alleged onset date, and 42 years old at the administrative hearing. (Tr. 89, 14). She is a college graduate and has been employed as a graphic designer and portrait photographer. (Tr. 220, 61).

## II.  ADMINISTRATIVE HEARING

At the hearing, Ms. Thompson testified she is 42 years old and lives with her parents and two sons, ages 15 and 12. (Tr. 41). Her only source of income is child support. (*Id.*). She has a driver's license but rarely drives. (Tr. 42). She completed high school and some college. (*Id.*). She has owned a photography business since 2013 but did not complete any assignments in 2020 due to the pandemic and her medical conditions. (Tr. 42, 45). Before that, she worked for the Star Beacon newspaper for 13 years as a graphic artist designing advertisements on the computer. (Tr. 43).

---

[1]      Ms. Thompson challenges determinations involving her anemia, mental health impairments, Postural Orthostatic Tachycardia Syndrome (POTS), and the medical necessity of her rollator walker. (See Pl.'s Br., ECF #11 at PageID 4119). I narrow the medical evidence to those issues but note some overlap with unrelated evidence.

She began working full-time at her photography business until 2018 when her POTS became worse and required use of a walker. (Tr. 44-45). She switched to doing "mini-shoots" that lasted only an hour at a time, but by 2019 to 2020, she was unable to do those. (Tr. 45). The photography business required her to carry between 10 and 20 pounds, crouch, sit down, and stand up. (Tr. 47).

Ms. Thompson can sometimes do the dishes or light laundry while sitting, but her parents help her with most things. (Tr. 48). If she does anything strenuous like vacuuming or climbing the stairs, she suffers syncope, tachycardia, and dizziness. (Tr. 52). She has a rollator walker with a seat so she can sit down quickly, if necessary. (*Id.*). She uses the walker most days, but has even fallen while using it – most recently a week before the hearing. (Tr. 53). She can only do activities in small spurts. (Tr. 52). She reads fantasy novels for an hour or two at a time and does artwork sitting down. (Tr. 48). She does not spend time with friends. (Tr. 49). She can sometimes go grocery shopping by using a motorized scooter and having her mom accompany her. (*Id.*). The scooter prevents her from getting dizzy and passing out on the floor and hurting herself, which has happened before. (*Id.*).

Her POTS prevents her from working. (*Id.*). She has syncope and passes out randomly at least once a week. (Tr. 49-50). She cannot stand for very long because she gets dizzy. (Tr. 50). She must lie on her back and put her feet up quickly before she passes out. (*Id.*). When she is tachycardic, her heart beats 120-130 times a minute, making her dizzy and sweaty, requiring her to lie down. (*Id.*). She did not recall her most recent trip to the ER but noted that "it's usually for passing out. It's usually for my heart rate." (*Id.*). She recently got dizzy, fell, and broke her ankle.

3

(*Id.*). Given her heart history, she goes to the ER when she has tachycardia to have it checked, where they usually give her fluids that help elevate her blood pressure. (Tr. 57).

POTS makes her unreliable, and she is unable to get out of bed two or three days a month because of the dizziness and must lie down; it is hard "to keep anything consistently going." (Tr. 51, 53). She testified "it's kind of like being on a boat most days." (Tr. 54). Her POTS can be triggered by any number of things—mostly standing, some sitting, sometimes temperature, any sort of movement, and other times randomly. (*Id.*).

Ms. Thompson began receiving mental health treatment because her doctor believed she was having panic attacks and post-traumatic stress disorder (PTSD from her medical problems. (Tr. 58). She has anxiety about leaving the house because she fears passing out. (*Id.*). As a result, she does not go anywhere by herself and does not drive. (Tr. 58-59). On some days, she can sit without changing positions for an hour or longer; other days, she can only sit ten minutes before having to lie down and elevate her feet. (Tr. 59). She can only stand for 10 to 20 minutes at a time. (*Id.*).

VE Brett Salkin then testified. He categorized her previous work at Star Beacon newspaper as a graphic designer, DOT #141.061-018, SVP 7 indicating a skilled occupation, classified and performed at sedentary exertion. (Tr. 61). Ms. Thompson's photography business is portrait photographer, DOT #143.062-030, SVP 7, skilled, classified and performed at light exertion. (*Id.*).

**Hypothetical One.** VE Salkin assumed an individual of Ms. Thompson's age, education, and past work history in a medium exertion role with the following limitations: the person can frequently climb ramps and stairs, but never climb ladders, ropes or scaffolds; can frequently stoop; can never walk unprotected heights, work near dangerous moving machines, and cannot

engage in commercial driving. (Tr. 62). VE Salkin testified that person could perform the graphic designer job. (*Id.*).

**Hypothetical Two.** Next, VE Salkin assumed the same individual, limited to light exertion, with the following limitations: occasionally climb ramps and stairs and never climb ladders, ropes, or scaffolds; occasionally stoop, crouch, and crawl; never walk at unprotected heights or near dangerous moving machinery; and cannot engage in commercial driving. VE Salkin testified this person could also perform the graphic designer job. (Tr. 62-63). Additional jobs this hypothetical individual can perform include cashier, DOT #211.462-010; foodservice worker, DOT #311.677-010; and packing line worker, DOT #753.687-038. (Tr. 63).

**Hypothetical Three**. VE Salkin then assumed the same individual in Hypothetical Two was further limited to only two hours of standing and walking. (*Id.*). VE Salkin testified that person could perform the graphic designer job as well as other jobs including account clerk, DOT #205.367-014; document preparer, DOT #249.587-018; and telephone quotation clerk, DOT #237.367-046. (Tr. 64).

In response to counsel's question, VE Salkin testified that two or more absences a month or being off-task 20% or more of the workday are work-preclusive. (Tr. 64-65). VE Salkin also testified a person who requires a rolling walker whenever they stand or walk would not be able to perform any jobs. (*Id.*).

## III. RELEVANT MEDICAL EVIDENCE

### A. Postural Orthostatic Tachycardia Syndrome (POTS)

Ms. Thompson frequently visits the emergency room for treatment of her conditions, including POTS. She was diagnosed with POTS via tilt table test in 2006. (Tr. 1416). One of her

5

earliest ER records indicates a syncopal or near-syncopal episode in March 2013. (Tr. 339). She wore an ambulatory heart monitor in 2016 demonstrating episodes of mild to moderate tachycardia. (Tr. 1392). A cardiac stress test, terminated early due to Ms. Thompson's fatigue, revealed adequate heart rate response. (Tr. 1397).

Ms. Thompson was hospitalized for eight days in 2017 following a witnessed syncopal event (Tr. 1375-85) where she underwent gait training due to impaired strength and balance and activity tolerance to function without assistance from caregivers. (Tr. 1366). She was discharged with a rollator walker with a seat. (Tr. 1370).

The remaining medical evidence prior to July 2017 consists of frequent ER visits for chest pain (Tr. 625, 665, 1288, 1301, 1411) and palpitations (Tr. 548, 644, 665, 1290, 1423), dizziness/lightheadedness (Tr. 711, 1314, 1406, 1417, 1425, 1435, 1458) with evidence of tachycardia (Tr. 654, 1290, 1407), abdominal pain (Tr. 625, 723, 1298, 1398, 1401, 1405), and a vasovagal episode (Tr. 1437). Her history of POTS-related symptoms includes heart racing, near syncope, and shortness of breath. (Tr. 625, 731, 1310, 1393, 1408, 1413, 1455, 498).

Between 2017 and 2021, Ms. Thompson visited the ER over 45 times. In August 2017, she reported feeling a rocking sensation as if she was on a boat, momentary but frequent dizziness, and headache every few days associated with photophobia, sonophobia, and osmophobia. (Tr. 1282). She was diagnosed with vertigo suggestive of paroxysmal positional vertigo, migraine without aura, and POTS, and was referred to vestibular rehabilitation. (Tr. 1284). She went to the ER for abdominal pain in October 2017 and in November 2017 for palpitations. (Tr. 1280-81). She was diagnosed with generalized abdominal pain, POTS, dizziness, joint pain, rash, and nausea. (*Id.*).

6

Ms. Thomas returned to the ER in December 2017 and February 2018 for abdominal pain and once in January 2018 for dizziness and tremor headaches, reporting she had passed out the day prior. (Tr. 773, 793, 1274-75). On February 9, 2018, she was evaluated in the department of rheumatic and immunologic diseases for widespread body pain, dizziness, and fatigue. (Tr. 1268). Her examination revealed decreased strength in hip flexors, scattered rashes on extremities, and tenderness to palpation throughout her spine. (Tr. 1271). Her presentation appeared most consistent with a centralized pain syndrome (such as fibromyalgia) in addition to sleep apnea and food sensitivities that confounded her clinical picture. (Tr. 1272).

Ms. Thompson returned to the ER on February 28, 2018 with nausea, vomiting and diarrhea; March 6 with chest pain and tachycardia; March 7 with low hemoglobin; March 12 with chest and abdomen pain; April 5 with fast heart rate and numbness, and April 15 with dizziness, palpations, and headache. (Tr. 812, 846, 1252, 1261, 1267). An EKG showed sinus tachycardia with a rate of 109. (Tr. 1255). She was advised to follow up with neurology. (Id.).

On April 26, 2018, Ms. Thompson returned to the ER via EMS due to chest pain, palpitations, and lower abdominal pain. (Tr. 857). She was tearful and anxious, explaining she was having a very painful menstrual cycle and was concerned about pelvic pain, but was unable to take pain medication because of her POTS. (Tr. 857-67). Her heart rate was 128 bpm. (Tr. 858-59). She was given IV fluid and a Bentyl injection that improved her symptoms. (Tr. 868). She returned to the ER in May 2018 with dizziness, anxiety, hyperventilating, and left-side facial tingling, and was diagnosed with acute chest pain, POTS, and anxiety. (Tr. 886).

On May 15, 2018, Ms. Thompson had a consultation with neurology for vertigo and imbalance sensation. (Tr. 1250). Imaging showed moderate to severe mastoid and mild to

moderate paranasal sinus disease. (Tr. 1252). She returned to the ER two days later with chest pain associated with headache, anxiety, and hyperventilation. (Tr. 902). On examination she was tachycardic with an EKG revealing sinus tachycardia. She was diagnosed with a UTI, nonspecific chest pain, and sinus tachycardia. (Tr. 902-08).

On referral, Ms. Thompson was seen for chronic pansinusitis on May 29, 2018. (Tr. 1248). She reported dizziness starting six months prior with a violent and unsteady initial episode. (*Id.*). Ms. Thompson returned to the ER on June 1, 2018 with dizziness, chest pain, and palpitations, exhibiting a heartrate of 127 bpm. (Tr. 1244). In a follow up on June 12, 2018, she reported ongoing episodes of feeling like she was on a boat with palpitations and an episode of bilateral leg numbness. (Tr. 1243). An MRI and flow study in June 2018 showed minimal cerebrospinal fluid flow at the level of anterior foramen magna and a 6-millimeter Chiari I malformation. (Tr. 1243-44). She was referred to neurosurgery and vestibular therapy. (*Id.*).

She was treated in the ER on June 17, 2018 for headache and tachycardia resolved with IV fluids, diagnosed with hypokalemia and headache. (Tr. 926) She returned on June 28, 2018 for chest pain and elevated heart rate. (Tr. 930). While her symptoms were indicative of anxiety, she "seem[ed] to be in denial that she may have an anxiety diagnosis." (*Id.*). She returned to the ER that same day with increased heart rate, then again two days later while suffering a panic attack and having difficulty breathing. (Tr. 941, 967, 981). On examination she exhibited significant somatic dysfunction, guarding, poor posture, and increased muscle tension, among other unrelated symptoms. (Tr. 983). She was given a Toradol injection, declined a muscle relaxant, and was recommended tissue massage. (*Id.*).

Ms. Thompson went to the ER on September 1, 4, and 11, 2018 with head and neck pain. (Tr. 1232, 1229, 1227). She was tachycardic again in the ER on September 18. (Tr. 991). On November 1, she returned with abdominal pain and exhibited panic and anxiety. (Tr. 1006). Her heart rate was 138 bpm and she was treated for abdominal pain and constipation. (*Id.*). At an ER visit on November 6 for frequent chest pain and heart rate, she appeared anxious and was diagnosed with acute chest pain and vomiting. (Tr. 1033).

Ms. Thompson presented in the ER on April 5, 2019 with heart palpitations and anxiety; medical notes reveal she was rambling and very nervous. (Tr. 1066). An EKG showed sinus tachycardia and palpitations. (Tr. 1225). On April 14, she presented with blurred vision, flashing to the right eye, dizziness, weakness, and nausea, and was diagnosed with sinusitis and tachycardia improved with IV fluids. (Tr. 1222). On April 30, she returned for nausea, diarrhea, and dizziness, (Tr. 1216) and her EKG again showed sinus tachycardia (Tr. 1219).

On May 11, 2019, Ms. Thompson saw Kathleen Shontz, M.S.N., FNP-C, due to coughing and difficulty breathing. (Tr. 1213). She was diagnosed with asthmatic bronchitis and nausea, and was prescribed an albuterol inhaler. (Tr. 1215-16).

On June 12, 2019, Ms. Thompson saw Navneet Kumar, M.D., a cardiologist. (Tr. 1203). She reported having multiple episodes daily lasting seconds to minutes where her heart races and she gets lightheaded and dizzy. (*Id.*). The cardiologist ordered a 30-day heart monitor. (*Id.*).

She was treated at the ER in June 2019 for palpitations and headache, and was admitted to the hospital with POTS and Wolff-Parkinson-White (WPW) syndrome. (Tr. 1188). She was discharged the following day. (Tr. 1193). She returned to the ER on July 24 (Tr. 1176) and 25 (Tr. 1077) for weakness, syncopal episodes, and abdominal pain.

Ms. Thompson saw Dr. Kumar on August 7, 2019, who diagnosed her with palpitations. (Tr.1172). She reported two episodes of syncope since her last visit, with one occurring while she was wearing a heart monitor. (*Id.*). The monitor exam did not show arrhythmias but did show sinus tachycardia. (*Id.*). The evaluation of the monitor and echocardiogram stated "89 symptomatic episodes reported of which the ones she felt escape beats showed ventricular or atrial extrasystole. However, most of them were sinus tachycardia…This may be an autonomic system dysfunction that we are dealing with." (*Id.*).

She was seen in the ER on August 16, 2019 for abdominal pain (Tr. 1102-10); September 3 for palpitations, chest pressure, and dizziness (Tr. 1117); September 7 for shortness of breath and sinus tachycardia (Tr. 1168); September 18 for weakness (Tr. 1144); October 30 for abdominal pain (Tr. 357); December 12 for abdominal pain and increased heartrate (Tr. 1161-62); December 30 for chest pain and syncope (Tr. 389); January 10, 2020 for dizziness, nausea, vomiting, and loss of consciousness (Tr. 1156); January 17 for fatigue and nausea (for which she refused treatment) (Tr. 1153-55); and January 31 for abdominal pain and constipation confirmed by imaging that also revealed enlarged liver and gallstones. (tr. 422).

She returned to the ER on February 20, 2020 for syncope and dizziness (Tr. 434); April 29 for chest pain after EMS found her "extremely anxious and whimpering" (Tr. 3652); June 21 for shortness of breath, heart racing, and right-sided numbness that she described as similar to prior symptoms of WPW (Tr. 3669); June 25 for abdominal pain, headache, and feeling like she was going to pass out (Tr. 3687); and July 15 for vomiting, diarrhea, lightheadedness, and chest pain (Tr. 3710) that was diagnosed as gastroenteritis. (Tr. 3717).

On October 21, 2020, Ms. Thompson was evaluated by a new cardiologist, Jeffery Courson, D.O., who recommended updated tilt table testing that documented a "significant increase in [heartrate] with passive stand at bed." (Tr. 3781). Dr. Courson discussed general lifestyle management recommendations for individuals with POTS including good sleep habits and hygiene, eating small and frequent meals, the role of dietary sodium, dietary fluid, the value of elevating the head of the bed, legging style compression stockings, a dedicated and progressive exercise program, and the role of medical therapy that can be an adjunct to help symptoms that are unresponsive to lifestyle management. (*Id.*).

The tilt test was repeated on November 13, 2020 but was stopped early at Ms. Thompson's request. (Tr. 3782). Catecholamines testing documented low epinephrine and elevated dopamine levels. (Tr. 3803). A postural increase in heart rate was noted from 82 bpm supine to 118 bpm at 12 minutes of 70-degree tilt; overall consistent with borderline to mild accentuated postural tachycardia with late rise in heart rate. (Tr. 3792). Dr. Courson diagnosed premature ventricular contraction, near syncope, fibromyalgia, atrial fibrillation, heart palpitations, POTS, and anemia. (*Id.*). He also noted she had recent onset symptomatic premature ventricular contractions associated with eating. (Tr. 3795).

She returned to the ER on December 11, 2020 with tachycardia and chest tightness (Tr. 3833) and December 14 with palpitations and heaviness in her chest (Tr. 3854). She reported passing out over the weekend despite taking propranolol beginning on December 13. (Tr. 3870). On discharge, she was recommended to switch from propranolol to acebutolol and was prescribed a heart monitor. (Tr. 3886).

11

At a follow up with Dr. Courson on December 16, 2020, he confirmed the tilt table test showed postural tachycardia. (Tr. 3792). Dr. Courson summarized that Ms. Thompson had been in the emergency room four times since the last visit due to syncope, increasing palpitations, tachycardia, and premature ventricular contractions, despite maintaining a high salt and fluid intake. (*Id.*). A stress echocardiogram treadmill test performed that day showed poor functional capacity with Ms. Thompson only achieving 75% of predicted heartrate as she was only able to exercise to 3.7 METS. (Tr. 3797). Even at this level, her heartrate rose to 133 bpm. (*Id.*). The stress echocardiogram findings included symptoms of near-syncope, shortness of breath, palpitations, and dizziness, and she was diagnosed with WPW Syndrome, premature ventricular contractions (PVCs), anemia, atrial fibrillation, and obesity. (Tr. 3799). The test was terminated due to dizziness and unsteady gait, and it was noted that Ms. Thompson had to hold on with both hands to complete the test. (Tr. 3800).

Later that day, she presented at the ER for palpitations lasting several minutes and dizziness, presenting as anxious, tearful, and hyperventilating. (Tr. 3900). Staff coordinated with the heart monitor company to confirm short runs of accelerated idioventricular rhythm and palpitations. (Tr. 3901).

### B.      Anemia

Ms. Thompson has a history since at least 2009 of anemia due to uterine fibroids. (Tr. 309, 319-20, 322-23, 324, 331, 336, 580, 681, 687, 731, 1148, 1152). Her anemia was described as "stable" on December 15, 2017 and May 6, 2018. (Tr. 294, 781). At an ER visit on March 7, 2018,

her hemoglobin was 9.7 (Tr. 812).[2] On March 12, 1018, at another ER visit, her hemoglobin was 10.7 and she was recommended to start iron. (Tr. 1264).

On March 30, 2018, she reported taking iron supplements, but she discontinued due to side effects. (Tr. 1256-62). She was prescribed a five-day course of iron and vitamin B12 repletion in 2020 but cancelled the appointments. (Tr. 2269, 2271). In December 2019, her hemoglobin was 8.9. (Tr. 1162). On two occasions in January 2020, her hemoglobin measured 8.9 and 9.2. (Tr. 1159, 424).

In February 2020, her annual gynecological exam noted history of anemia due to chronic blood loss and lack of iron. (Tr. 2276). She began the process of scheduling infusion therapy of iron and vitamin B12 on February 17, 2020. (Tr. 2270). At an ER visit later that month, she was diagnosed with chronic anemia and her hemoglobin was 9.0. (Tr. 440). At an ER visit in April 2020, her hemoglobin was 10.1. (Tr. 3652). She underwent extensive blood work in August 2020, revealing hemoglobin at 9.7. (Tr. 3635). Her sedimentation rate on August 27, 2020 was high at 48. (Tr. 3636). She also had an elevated CU Index score, which supports an autoimmune basis for disease. (Tr. 3644).

In a December 2020 ER visit for tachycardia and chest tightness, her hemoglobin was 9.7. (Tr. 3840). At another ER visit later that month, it was 9.3. (Tr. 3863). At a visit with Dr. Courson that same month, it was 9. (Tr. 3795).

---

[2]    For context, an individual meets Listing 7.05, hemolytic anemias, with hemoglobin measurements of 7.0 grams per deciliter (gm/dL) or less, occurring at least three times within a 12-month period with at least 30 days between measurements. 20 C.F.R. Pt. 404. Subpt. P. App. 1, §§ 7.05(C). According to the Cleveland Clinic, a normal hemoglobin level for women ranges between from 12.3 to 15.3 gm/dL. *Low Hemoglobin*, Cleveland Clinic (May 4, 2022), https://my.clevelandclinic.org/health/symptoms/17705-low-hemoglobin (last visited Mar. 15, 2023).

By February 2021, Ms. Thompson was status post five iron infusions. (Tr. 3942). On February 15, 2021, her hemoglobin was 10.8. (Tr. 3953). She received another iron infusion March 21, 2021. (Tr. 3981).

### C.    Mental Health

Ms. Thompson suffers from anxiety disorder. (Tr. 1295). However, she has resisted treatments because they have worsened her POTS symptoms. (Tr. 629).

On December 9, 2020, Ms. Thompson sought treatment for what she described as "really bad anxiety" and significant depression for the past three years. (Tr. 3924). She was diagnosed with PTSD due to trauma. (Tr. 3934). Anxiety, panic disorder, and major depressive disorder were ruled out because the trauma is "the source of all of her mental health issues." (*Id.*).

## IV.    MEDICAL OPINIONS

Ms. Thompson underwent a psychological consultative examination on November 13, 2017 with Louis Decola, Jr., Ph.D. (Tr. 281). She was diagnosed with depressive disorder and an unspecified anxiety disorder, with panic attacks. (Tr. 284). Prognosis was poor without treatment. (*Id.*). On examination, she appeared anxious, fidgety, and depressed; her muscles appeared tense; she had fair eye contact, looking down and away about 45% of the time. (*Id.*). She moved slowly and her energy level was below average, but she had no tendency to minimize or exaggerate problems. (Tr. 285). Dr. Decola concluded Ms. Thompson would have below average abilities maintaining effective social interaction on a consistent and independent basis based on her mood, eye contact, energy level, and rate of movement. (Tr. 286). She was likely to have below-average abilities in dealing with normal pressures in a competitive work setting as she appeared anxious, fidgeted, and had muscle tension. (*Id.*).

14

On July 21, 2020, Ms. Thompson underwent a psychological consultative examination with Natalie M. Whitlow, Ph.D. (Tr. 3614). She was diagnosed with adjustment disorder with anxiety (Tr. 3621), with mild to moderate level of severity of her symptoms. (Tr. 3622). Dr. Whitlow opined the conditions cause no functional limitations. (Tr. 3623).

On July 22, 2020, state agency examiner Janet Souder, Psy.D., reviewed the consultative examination report, neurology records, Cleveland Clinic records, and the adult functional report, among other records. (Tr. 91). She concluded Ms. Thompson would have average intellectual function and abilities, but below average abilities in dealing with normal pressures in a competitive setting. (Tr. 94). She assessed no functional limitations. (*Id.*).

On April 15, 2021, Ms. Thompson underwent a functional capacity evaluation (FCE) with Lori Layton, a licensed physical therapist. (Tr. 4020). The record contains a medical source statement form that is unsigned and undated, but presumably was completed by Ms. Layton after the FCE. (Tr. 4019). The source statement limited Ms. Thompson to lifting no more than 2 pounds; standing and walking less than 2 hours a day; sitting 8 hours a day but for less than 1 hour at a time with notation that she needs to frequently elevate legs above heart level due to syncope secondary to POTS; never climb or balance; rarely stoop, crouch, kneel, and crawl; occasionally reach; rarely push/pull; is prescribed a rollator walker due to POTS and crutches due to her broken ankle; requires the ability to elevate her legs at will to 120 degrees; needs a sit/stand/walk at-will option; and has pain that would interfere with concentration, take her off task, and cause absenteeism; and would require 1 to 2 hours of additional breaks during the day. (Tr. 4018-19).

15

THE ALJ'S DECISION

The ALJ's decision, dated June 17, 2021, included the following findings of fact and

conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security
       Act through December 31, 2024.

2.    The claimant has not engaged in substantial gainful activity since June 1,
       2013, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.    The claimant has the following severe impairments: postural orthostatic
       tachycardia syndrome (POTS), obesity, migraines and degenerative disc
       disease (20 CFR 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments
       that meets or medically equals the severity of one of the listed impairments
       in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d),
       404.1525, and 404.1526).

5.    After careful consideration of the entire record, I find that the claimant has
       the residual functional capacity to perform light work as defined in 20 CFR
       404.1567(b) except she can occasionally climb ramps and stairs, but never
       climb ladders, ropes and scaffolds. Claimant can occasionally stoop, crouch
       or crawl. Claimant can never work at unprotected heights or around
       dangerous moving machinery. She cannot engage in commercial driving.

6.    The claimant is capable of performing past relevant work as a graphic
       designer. This work does not require the performance of work-related
       activities precluded by the claimant's residual functional capacity (20 CFR
       404.1565).

7.    The claimant has not been under a disability, as defined in the Social
       Security Act, from June 1, 2013 through the date of this decision (20 CFR
       404.1520(f)).

(Tr. 19-28).

STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the

Commissioner's conclusions absent a determination that the Commissioner has failed to apply the

16

correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security,* 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Ms. Thompson brings three challenges to the ALJ's determination: first, the ALJ erred in failing to recognize her anemia and mental health impairments as severe and in failing to evaluate their effects on her residual functional capacity (RFC); second, the ALJ's analysis of POTS-related symptoms is too vague and not adequately reflected in the RFC; and third, the ALJ failed to properly evaluate the medical necessity of Ms. Thompson's rollator walker. (Pl.'s Br., ECF #11, PageID 4138-46). I address each argument in turn, but find none of them sufficient to warrant remand.

**I.    The ALJ committed harmless error in finding Ms. Thompson's anemia non-severe, and did not err in finding her mental health impairments non-severe.**

First, Ms. Thompson argues both her anemia and mental health should have constituted "severe" impairments. At Step Two, the severity determination is "a *de minimis* hurdle in the disability determination process," the goal of which is to "screen out totally groundless claims." *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (citations omitted). The Sixth Circuit has determined the failure to analyze the character of other impairments at Step Two is not a

19

reversible error so long as the ALJ has already determined at least one of the claimant's impairments is severe. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987). The ALJ's finding of least one severe impairment means Ms. Thompson has cleared Step Two and therefore the failure to find any other severe impairment constitutes harmless error. *Anthony*, 266 F. App'x at 457 (citing *Maziarz v. Sec'y of Health & Hum. Servs.*, 837 F.2d 240 (6th Cir. 1987)). Whether any remaining impairments are severe is not "legally relevant" given the ALJ's determination that one impairment was severe and therefore had to consider all impairments throughout the decision. *Id.*

Ms. Thompson acknowledges this precedent but argues that each severe impairment and their "specific limitations" must be accounted for in the RFC and any hypothetical presented to the VE. (Pl.'s Br., ECF #11 at PageID 4141) (citing *Jones v. Comm'r of Soc. Sec.*, No. 142 F. Supp. 3d 620, 630 (S.D. Ohio 2015)). She argues the anemia and mental health impairments should have been considered "severe," but her reasoning is that "each severe impairment and the 'specific limitations' must be accounted for in the ALJ's RFC, and any hypothetical presented to the" VE. (*Id.*).

A.    Anemia

The ALJ's June 17, 2021 decision stated: "Celiac disease, anemia and Chiari malformation cause no more than minimal limitations and are not considered to be severe impairments. The record shows the claimant started iron infusion for anemia in 2021. This treatment has not yet lasted for one year." (Tr. 20) (citations omitted).

At a checkup on June 16, 2020, NP Donna Sheehan noted Ms. Thompson "[h]as a long history of anemia and gets iron infusions at Geneva hospital. Is having low energy and fatigue

20

ongoing since her last infusion in 3/2020. Unable to get home care to come to the house for infusions." (Tr. 81). Thus, as of March of 2020, the record confirms Ms. Thompson had received at least one infusion. The ALJ therefore erred in stating "the record shows the claimant started iron infusion for anemia in 2021. This treatment has not yet lasted for one year." (Tr. 20).

The ALJ further concluded Ms. Thompson's anemia caused only "minimal limitations" and is not considered to be severe, citing Exhibits 3F-8F that contain over 3000 pages of the record. (Tr. 20).[3] But so long as the ALJ considered all of the claimant's impairments in the later steps of the sequential evaluation, a finding that a condition is non-severe constitutes harmless error. *See Maziarz,* 837 F.2d at 240. Here, the Commissioner argues the ALJ's finding that Ms. Thompson's anemia is non-severe is supported by the lack of medical evidence demonstrating that her anemia results in functional limitations. (Comm'r's Br., ECF #12, PageID 4187). Ms. Thompson's brief identifies only instances in the record where her anemia was medically determinable. (Pl.'s Br., ECF #1, PageID 4139-40). She emphasizes the history of anemia, instances of low hemoglobin, and iron infusions, stating the ALJ "failed to identify any of this evidence or its potential support for Ms. Thompson's allegations of weakness, fatigue, and a cause for palpitations." (*Id.* at 4140).

Ms. Thompson bears the burden of proving that her anemia results in functional limitations. 20 C.F.R. § 404.1512(a). No medical source indicated that any limitations resulted from her anemia, nor does Ms. Thompson point to any specific record evidence demonstrating that her anemia causes any limitations. Thus, although the ALJ's explanation for why he found

_____

[3]     To the extent the ALJ may have relied on other evidence, it is not articulated in his decision.

Ms. Thompson's anemia non-severe could have been more robust than simply citing 3000 pages of medical records as support, such error is harmless because there are no functional limitations resulting from her anemia and remand would bring about the same ultimate result. "The Court need not remand where doing so is futile." *Beard v. Saul*, No. 1:18-CV002500, 2019 WL 5684454, at *12 n.10 (N.D. Ohio Nov. 1, 2019).

For these reasons, I find  only harmless error arises from the ALJ finding Ms. Thompson's anemia non-severe. Therefore, I decline to order a remand on this basis.

**B.  Mental Health**

Ms. Thompson makes the same challenge regarding her mental health impairments. (Pl.'s Br., ECF #11, PageID 4141-42). She argues her mental health impairments caused more than a minimal limitation on her functioning, should have been found severe, and been accounted for in the RFC. (*Id.*).

The ALJ's Step Two analysis of Ms. Thompson's mental health impairments runs two pages. (Tr. 20-21). He considered the state agency examination by Dr. Whitlow; the diagnostic assessment at Crossroad in December 2020; the history and efficacy of various medications managing her anxiety and depression; diagnosis of PTSD; and her abilities in areas of mental functioning set out in the disability regulations for evaluating mental disorders. (*Id.*). As a result of this in-depth analysis, the ALJ concluded the medically determinable mental impairments of major depressive disorder and anxiety, considered singly and in combination, do not cause more than minimal limitation on Ms. Thompson's ability to perform basic mental work activities and are therefore non-severe. (Tr. 21).

Ms. Thompson argues the ALJ's evaluation of the evidence of mental impairment was limited to the two consultative examinations and an evaluation by Ms. Thompson's mental health provider. (Pl.'s Br., ECF #11, PageID 4141). She then cites a plethora of ER records in which her anxiety is documented and argues "this is substantial evidence that Ms. Thompson's mental health impairments were causing more than minimal limitation on her functioning." (*Id.*).

Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. The Sixth Circuit has long held "[a]lthough required to develop the record fully and fairly, an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004) (quotation omitted); *see also Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004) ("An ALJ need not discuss every piece of evidence in the record for his decision to stand."). Although the ALJ did not explicitly cite the ER records Ms. Thompson points to, substantial evidence supports his conclusion that Ms. Thompson's anxiety and depression are non-severe such that they cause no more than a minimal limitation in her ability to perform mental work.

Substantial evidence supports the ALJ's finding Ms. Thompson's mental impairments non-severe. Therefore, I reject Ms. Thompson's argument with respect to those impairments.

## II.    The RFC adequately accounts for Ms. Thompson's POTS-related limitations.

Ms. Thompson next argues the ALJ discounted Ms. Thompson's reported POTS symptoms, and minimized her frequent cardiology, neurology, and rheumatology follow-ups. (Pl.'s

Br., ECF #11, PageID 4143). As a result, Ms. Thompson argues the RFC does not appropriately

account for the limitations caused by her POTS. (*Id.*).

> The ALJ concluded:
>
> The claimant is limited by POTS and her other impairments. The record does not
> support the severity alleged by the claimant. The record shows multiple emergency
> room visits with infrequent follow up/treatment outside the emergency room.
>
> The claimant is limited to light exertion. Due to POTS, claimant is limited in
> climbing ramps and stairs, ladders, ropes and scaffolds. She can never work at
> unprotected heights or around dangerous moving machinery. She cannot engage in
> commercial driving. Claimant can occasionally stoop, crouch or crawl.

(Tr. 26).

Ms. Thompson argues this conclusion contradicts evidence in the record, especially her

own testimony as well as her dozens of trips to the ER for POTS-related symptoms. (Pl.'s Br., ECF

#11, PageID 4144). She argues that by describing her treatment as "infrequent," the ALJ implied

Ms. Thompson should have done more to treat her conditions, "despite routinely treating with

cardiology and neurology and under[going] all of the testing that they recommended." (*Id.*). She

also notes she complied with requirements to increase fluid and salt intake. (*Id.*, citing Tr. 3788).

She believes the ALJ failed to explain why the RFC did not give additional limitations for being

off-task or absent as a result of the syncope and near-syncope episodes, dizziness, and palpations.

(*Id.*).

The ALJ is correct there are few treating notes regarding follow up care, diagnosis,

symptom management, or long-term solutions to Ms. Thompson's POTS-related problems outside

of the ER. (Tr. 24). Although Ms. Thompson points to her numerous ER visits as evidence that

her POTS is severely limiting, it appears most visits for POTS-related symptoms are resolved with

IV fluids and yield relatively normal test results, with the patient often refusing further treatment.

Take, for example, a span of visits in 2018. At an ER visit on April 26, 2018, her tachycardia was resolved with fluids. (Tr. 868). She refused a CT scan and VQ scan and showed no indication of any respiratory or circulatory compromise. (*Id.*). She spent most of her stay texting on her phone and was advised that symptomatic control could be done via outpatient follow-up. (*Id.*).

Six days later, at another ER visit for identical symptoms, she reported being told by her neurologist that she must continue to "manage her symptoms," but confessed she was "unsure what that exactly means" and was "having difficulty with her Cleveland Clinic physician in general regarding getting improvement in her symptoms." (Tr. 883). ER staff offered to refer her to a new physician. (*Id.*). She was counseled that "she has no emergent conditions currently and her condition certainly can be managed in outpatient treatment given that it is an ongoing chronic issue that is very complex in nature." (Tr. 886) (cleaned up). At an ER visit on May 17, she agreed to follow-up with her primary physician in 2-3 days, but the record shows no such follow-up. (Tr. 908).

At an ER visit in June of 2018, she presented as tachycardic, but the issue resolved while receiving a fluid bolus. (Tr. 925). She was offered but refused medications to alleviate headache and dizziness. (*Id.*). The physician "emphasized the importance of follow-up with the physician I referred [her] to in the timeframe recommended. I explained reasons for the patient to return to the [ER]." (*Id.*).

That same month, she returned for the same symptoms and again declined pain medications. (Tr. 935). The physician discussed that her constant return to the ER and symptoms may be a component of anxiety, and she stated that "multiple physicians have asked her about anxiety in the past." (*Id.*). "She seems to be in denial that she may have an anxiety diagnosis." (*Id.*).

25

Labs were unremarkable and she requested to return home. (*Id.*). Staff again stressed follow-up with her primary care physician. (*Id.*).

On July 30, her ER treatment notes included more of the same: "I think this represents hyperventilation and panic attack. Patient has few risk factors for strokes...Patient was offered Klonopin as she did appear anxious and trembling. She appeared to be suffering from a panic attack." (Tr. 967). "Retrospective review of the patient's presentation to the emergency department [indicates] she did come here quite frequently. Nursing staff knows her well." (*Id.*).

The ALJ therefore determined:

> The record shows numerous visits to the emergency room visits over the years for various complaints, often palpitations and/or abdominal pain with little findings on testing (Exhibit 3F/10-11, 23, 36; 4F/213; 5F/10, 21, 46, 66, 86, 99; 6F/240; 7F/2799; 10F/27, 44, 62). Claimant has a diagnosis of POTS, but the objective tests do not support the significant limitations alleged by the claimant. The record consists mostly of emergency room visits with few treating notes regarding follow up or treatment outside the emergency room.

(Tr. 24). At the follow-ups that Ms. Thompson did seek out, her POTS diagnosis and its limitations were not determined with any amount of certainty. For example, in October of 2020, she followed up with Dr. Courson, who recommended an updated tilt table test because the initial test was completed fourteen years prior. (Tr. 3777). He explained:

> As she is new to me, has not been seen in over 3 years, I would wait until I see the response from her tilt before I would [fill out disability paperwork]. I am not questioning her diagnosis but she has not had regular follow up and a significant proportion of POTS will improve over time. I did notice a significant increase in HR with passive stand at bed side. I reiterated that POTS requires lifestyle management. I reinforced the need for good sleep habits and sleep hygiene. We discussed eating small and frequent meals ("grazing"), the role of dietary sodium but advised we wait to see her tilt before she adopts any changes, if she is having HTN response then would not pursue high sodium diet, I discussed dietary fluid of 2-3 liters per day with at least half being water. I discussed the value of elevating the head of the bed. I discussed legging-style compression stockings and most importantly the role of a dedicated and progressive exercise program. I reviewed

> each of these in detail, providing examples of how to incorporate and answering her questions. We discussed the role of medical therapy which can be an adjunct to help symptoms that do not respond to lifestyle management.

(*Id.*) (cleaned up). She underwent a repeat tilt, stopping early at 38 out of 45 minutes, which was negative for syncope and indicated only borderline to mild postural tachycardia. (Tr. 3741). She then followed up in December and reported not taking her medications and worsening palpitations. (Tr. 3787).

Based on the entirety of the record, substantial evidence supports the ALJ's determination regarding the severity of Ms. Thompson's POTS symptoms. While Ms. Thompson may have some limitations resulting from her POTS, she appears capable of managing this condition and no record evidence reflects any serious measures taken to improve those symptoms other than constant return to the ER for fluids to resolve tachycardia.

To be clear, there is no threshold for the consistency of follow-up required to demonstrate a claimant's limitations. But routine follow-ups would provide a more holistic picture of the limitations Ms. Thompson alleges in her testimony. The few notes the record does contain from ongoing treatment relationships regarding the nature and severity of her condition did not include any testing or observation that her POTS is as debilitating as she alleges; rather, they indicate only borderline to mild postural tachycardia. Even then, the record contains no evidence of any observed or recommended postural limitations. The ALJ thus justifiably noted "the record lacks evidence showing the claimant has been told to lie down with her feet elevated." (Tr. 25).

Additionally, Ms. Thompson's brief points to no evidence corroborating her testimony regarding the requested postural or exertional limitations. Even still, in at least one instance the ALJ found more restrictive exertional limitations than those by state agency consultants:

27

State agency consultant Mehr Siddiqui, MD, reviewed the record on May 8, 2020. Dr. Siddiqui found the claimant can perform medium exertion. She can frequently climb ramps and stairs, but never climb ladders, ropes and scaffolds. She should avoid unprotected heights, heavy hazardous machinery and commercial driving. State agency consultant Abraham Mikalov, MD, reviewed the record on October 21, 2020, and assessed the same limits as Dr. Siddiqui. Dr. Mikalov added an additional limitation of frequent stooping. These administrative findings are not persuasive because the record supports limiting the claimant to light exertion.

(Tr. 26) (citations omitted).

Because substantial evidence supports the RFC regarding Ms. Thompson's POTS, I find her second argument unpersuasive.

**III.    Substantial evidence supports the RFC's omitting use of a rollator walker.**

Finally, Ms. Thompson argues the RFC disregards her need for a rollator walker. (Pl.'s Br., ECF #11, PageID 4144). She argues the walker was prescribed and the ALJ's focus on Ms. Thompson having an un-impaired gait misses the basis for her medical necessity for the walker, which is to have a place to sit down to avoid loss of consciousness as a result of her POTS. (*Id.*). She cites witnessed syncope events as proof that the ALJ's determination regarding the walker was erroneous. (*Id.* at 4146).

The ALJ explained Ms. Thompson "testified she uses a rollator or walker to sit down when she feels syncope. The record does not document the need for such a device. [Ms. Thompson] did not testify she needs to use the device for walking. Records show a normal gait." (Tr. 26).

To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information). SSR 96-9p.

28

The walker was prescribed on March 1, 2017 by a physical therapist. (Tr. 1366). Progress notes stated "[a]nticipate that patient will be safe to return home from a PT perspective with PRN assist at home, a rollator for balance and decreased activity tolerance and outpatient PT to continue to improve deficits." (Tr. 1366-67). "P[atient] provided w[ith] OP PT script, OP PT contact list and rollator script." (*Id.*). Importantly, the walker prescription was discontinued on January 9, 2018. (Tr. 3583).

The record therefore indicates the walker was prescribed "for balance and decreased activity tolerance" despite Ms. Thompson's claim that its primary use is to have a place to sit in the event of syncope. Regardless, the prescription was discontinued less than a year after it was issued. While use of the rollator may remain helpful for Ms. Thompson, she cites no record evidence demonstrating its medical necessity other than the original prescription that lapsed in 2018.

The ALJ applied the proper legal standards and substantial evidence supports his determination that the medical evidence of record did not establish that a rollator walker was medically required. Therefore, I find Ms. Thompson's final argument unpersuasive.

### CONCLUSION

Following review of the arguments presented, the record, and the applicable law, I **AFFIRM** the Commissioner's decision denying disability insurance benefits.

Dated: March 15, 2023

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE